# N THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| P. MICHAEL COLEMAN, | ) |
|---|---|
| Plaintiff, | ) |
| v. | ) CIVIL ACTION 15-0367-WS-M |
| UNUM GROUP CORPORATION, | ) |
| Defendant. | ) |

## ORDER

This matter is before the Court on the defendant's motion for partial summary judgment. (Doc. 90). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 91-92, 101-03, 105-06), and the motion is ripe for resolution. After careful consideration, the Court concludes the motion is due to be granted.

## BACKGROUND

The plaintiff purchased an "own occupation" disability policy from the defendant's predecessor. He made a claim for benefits in October 2012, and the defendant paid benefits until December 2014. The amended complaint, (Doc. 30), asserts a claim for breach of contract and a claim for bad faith based on the December 2014 cessation of benefits. The defendant seeks summary judgment as to the bad faith claim only.

## DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial

burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[1] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced.

Alabama law recognizes two forms of bad faith: "normal" and "abnormal." These are not two torts but a single tort "with different options for proof." *State Farm Fire and Casualty Co. v. Brechbill*, 144 So. 3d 248, 257-58 (Ala. 2013). The plaintiff invokes both. (Doc. 30 at 4-5; Doc. 102 at 25).

"We have repeatedly held that the tort of bad-faith refusal to pay a claim has four elements – (a) a breach of insurance contract, (b) the refusal to pay claim, (c) the absence of arguable reason, (d) the insurer's knowledge of such absence – with a conditional fifth element: (e) if the intentional failure to determine the existence of a lawful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim." *Brechbill*, 144 So. 3d at 258 (internal quotes omitted). "Thus, for the tort of bad-faith refusal to pay, requirements (a) through (d) represent the 'normal' case. Requirement (e) represents the 'abnormal' case." *Id*. (internal quotes omitted).

---

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so."). "[A]ppellate judges are not like pigs, hunting for truffles buried in briefs," and "[l]ikewise, district court judges are not required to ferret out delectable facts buried in a massive record …." *Chavez v. Secretary, Florida Department of Corrections*, 647 F.3d 1057, 1061 (11th Cir. 2011) (internal quotes omitted).

The *Brechbill* decision makes clear that the conditional fifth element is a potential substitute for the fourth element, but not for the third element, which the plaintiff must prove in every case. "Regardless of whether the claim is a bad-faith refusal to pay or a bad-faith refusal to investigate, the tort of bad faith requires proof of the third element, absence of legitimate reason for denial …." 144 So. 3d at 258. "The existence of an insurer's lawful basis for denying a claim is a *sufficient condition* for defeating a claim that relies upon the fifth element of the insurer's intentional or reckless failure to investigate." *Id*. (emphasis in original). Thus, "[a] bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied." *Id*. at 260. "[R]*egardless of the imperfections of* [*the insurer's*] *investigation*, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim." *Id*. at 259 (internal quotes omitted, emphasis in original).

The defendant relies on *Brechbill*, (Doc. 91 at 19-20), yet the plaintiff ignores it. Instead, the plaintiff cites two federal cases that – consistent with *Brechbill* – identify the conditional fifth element as a substitute for the fourth element and require the third element to be satisfied in all cases. (Doc. 102 at 27). Such authorities obviously do not advance the plaintiff's cause.

The plaintiff also cites *Employees' Benefit Association v. Grissett*, 732 So. 2d 968 (Ala. 1998), one of several opinions from the Alabama Supreme Court (all decided before *Brechbill*) capable of being read for the proposition that a plaintiff pursuing the abnormal form of bad faith need not satisfy the third element of the normal case. The plaintiff , however, simply cites the case without attempting to explain why it should take precedence over *Brechbill*. As noted, the Court will not undertake to articulate or develop arguments the parties have declined to make or support on their own, and the plaintiff's mere citation does not constitute argument.

Finally, the plaintiff relies on *Mutual Service Casualty Insurance Co. v. Henderson*, 368 F.3d 1309 (11th Cir. 2004), but that case actually explains why *Brechbill* should be followed. The defendant in *Henderson* relied on *Weaver v. Allstate Insurance Co.*, 574 So. 2d 771 (Ala. 1990), for the proposition that "a debatable reason is enough to defeat an 'abnormal' bad faith claim." 368 F.3d at 1315 n.2. The Eleventh Circuit "ch[o]se to follow the rationale of *Grissett* and [*State Farm Fire & Casualty Co. v.*] *Slade*[, 747 So.2d 293 (Ala. 1999)] rather than *Weaver*, because *Grissett* and *Slade* are the more recent cases and therefore indicate that the Alabama Supreme Court has moved away from its reasoning in *Weaver*." *Id*. The Eleventh Circuit thus counsels that the federal courts should follow the most recent Alabama Supreme Court pronouncement on this issue, which is now represented by *Brechbill*.

The Court has acknowledged that "[t]he *Brechbill* decision returns the Supreme Court (if it ever left) to the rule expressed in *Weaver*" and "put[s] … to rest" the argument that "the third element of a bad faith claim d[oes] not apply in abnormal cases." *Joffrion v. Allstate Insurance Co.*, 2014 WL 3518079 at *8 (S.D. Ala. 2014); *accord Bailey v. National Union Fire Insurance Co.*, 2015 WL 1883725 at *8 (N.D. Ala. 2015) (*Brechbill* "settled the debate" over whether the third element is required to establish the abnormal form of bad faith). Whatever arguments to the contrary (if any) might be made, the plaintiff has forfeited them by silence.

The parties agree that the policy provides for disability benefits only if "You [the insured] are unable to perform the important duties of Your Occupation." (Doc. 91 at 2; Doc. 92-5 at 16; Doc. 102 at 3). The defendant informed the plaintiff it was terminating benefits because "[w]e have determined you are able to perform the duties of your occupation." (Doc. 92-4 at 58).[2] The

---

[2] The parties for the most part speak of "duties" rather than "important duties" – perhaps because the adjective is ambiguous and thus to be construed against the insurer. Whatever the reason, the Court follows the convention.

5

question is whether this constituted an adequate reason for purposes of the third element.

The *Brechbill* Court described the sort of reason envisioned by the third element as "arguable," "legitimate," and "debatable," and it also spoke of a "lawful basis" for denying a claim. 144 So. 3d at 258, 260. Since the tort's inception, these terms have been used interchangeably.[3] "The 'debatable reason' under [element] (c) above means an arguable reason, one that is open to dispute or question." *National Security Fire & Casualty Co. v. Bowen*, 417 So. 2d 179, 183 (Ala. 1982). As the plaintiff insists, "[i]n assessing whether the insurer had an arguable reason, the court must look to the information before the insurer at the time it denied the claim." (Doc. 102 at 25 (internal quotes omitted); *accord id.* at 28). That date, as the plaintiff acknowledges, is December 19, 2014. (*Id.* at 9-10, 25). The question is thus whether, on December 19, 2014, based on the information before the defendant, it was debatable whether the plaintiff was able to perform the duties of his occupation. As discussed below, clearly it was.

The parties agree that the plaintiff's occupation for purposes of the policy is that of CEO/consultant. (Doc. 91 at 2; Doc. 102 at 2). In his claim form, the plaintiff identified the duties of these occupations as including management of staff, finances, operations and administration; e-mail and phone communications; leading business meetings; extensive interaction with consulting clients; writing articles and books; media interviews and public speaking; and extensive travel (two days a week on average). (Doc. 103-2 at 5, 9). The plaintiff identified his occupation's daily physical requirements as including frequent sitting and occasional standing, walking, bending/stooping, reaching, twisting, carrying, pushing/pulling and lifting. The plaintiff identified cognitive requirements as including working under emergency, official or dangerous situations; meeting

---

[3] *See Gulf Atlantic Life Insurance Co. v. Barnes*, 405 So. 2d 916, 924 (Ala. 1981) ("'No lawful basis' … means that the insurer lacks a legitimate or arguable reason for failing to pay the claim. [citation omitted] That is, when the claim is not fairly debatable, refusal to pay will be bad faith ….").

6

deadlines; attention to detail; daily contact with others; making independent decisions; and creativity. (*Id*. at 10). After a field visit to the plaintiff, the defendant's vocational consultant clarified the plaintiff's CEO duties as including planning, developing and establishing organizational policies and objectives; coordinating operations between divisions and departments; reviewing data to assess progress toward objectives; directing operations regarding funding and investments; planning and developing marketing and public relations; performing presentations within and outside the organization; evaluating executive performance; and presiding over board meetings. (*Id*. at 78). The vocational consultant clarified the plaintiff's consultant duties as including providing problem-solving and resolution to issues identified by the client; obtaining and analyzing data needed to define and resolve such problems; advising the client regarding changes to policies, procedures, practices and methods; and providing support and direction to the client's executive-level employees. (*Id*.). The plaintiff has identified no other duties of his occupation. (Doc. 102 at 4-6).

In October 2012, the plaintiff underwent two days of spinal surgery at Johns Hopkins (including fusion of C-2 to -7) to relieve symptoms of spinal cord compression/cervical stenosis. In December 2012, he filed a claim for disability benefits, which the defendant honored. (Doc. 103-2 at 80). In support of his claim, the plaintiff submitted an attending physician statement ("APS") from Dr. Gokaslan, his neurosurgeon, that restricted the plaintiff from twisting, bending or stooping, from prolonged sitting, standing or walking, and from lifting over ten pounds. (*Id*. at 4). As the plaintiff acknowledges, (Doc. 102 at 6-7), the defendant's vocational consultant identified the physical demands of the plaintiff's occupation and concluded that, "based on the frequent sitting and bending, lifting, and standing associated with travel, that the demands of this occupation exceed the supported restrictions and limitations at this time," with the defendant honoring the claim on this basis. (Doc. 103-2 at 78-80).

In February, August and October 2013, Dr. Gokaslan submitted new APS's, each of which retained the physical restrictions noted above. (Doc. 92-2 at 7, 54, 68). In April 2014, Dr. Gokaslan submitted another APS, in which he removed or loosened these restrictions. The plaintiff was permitted to twist, bend and stoop occasionally (up to 1/3 of the time), to sit, stand and walk frequently (up to 2/3 of the time), and to lift up to 30 pounds occasionally. (Doc. 92-3 at 18-19). As the plaintiff acknowledges, (Doc. 102 at 16), the defendant's vocational consultant in November 2014 wrote a new evaluation, finding that "[t]he demands of this occupation do not exceed the supported functional capacities noted on the 4/23/14 APS." (Doc. 103-3 at 86).

The plaintiff does not assert that the physical demands of his occupation are greater than those identified by the defendant's vocational consultant. Nor does he assert that his restrictions in these areas are greater than those noted by Dr. Gokaslan in April 2014. In consequence, he does not assert his inability to perform the sitting, standing, walking, lifting and associated demands of his occupation. Instead, the plaintiff argues that other physical issues, which may be "residual symptoms" of his spinal surgery or of the underlying condition, prevent him from performing the duties of his occupation. (Doc. 102 at 2).

In July 2014, the plaintiff's treating neurologist, Dr. Hecker, formed an impression of "probable dysautonomia" as the "best explanation" for the plaintiff's symptoms. (Doc. 103-3 at 73). Also in July 2014, on a visit to Johns Hopkins to see Dr. Gokaslan, the plaintiff was seen on consultation by Dr. Ratchford, another neurologist, who included "autonomic dysfunction with labile blood pressure" in his assessment. (*Id*. at 53). In August 2014, the plaintiff's internist, Dr. Kessler, identified dysautonomia as among the plaintiff's "active problems." (*Id*. at 66). Also in August 2014, Dr. Hecker repeated his impression of dysautonomia as the "likely cause" of the plaintiff's symptoms. (*Id*. at 72). In November 2014, Dr. Hecker recorded his impression of dysautonomia, with "some improvement." (*Id*. at 93). According to the plaintiff, the defendant was in

8

possession of all these reports before terminating the plaintiff's benefits. (Doc. 102 at 9).

As the plaintiff concedes, dysautonomia – a disorder of the autonomic nervous system – varies widely in symptomology, severity and duration. (Doc. 102 at 2 n.2, 13; Doc. 103-18 at 22). For purposes of his bad faith claim, the question thus becomes whether, based on the information the defendant possessed on December 19, 2014, it was debatable or arguable – that is, open to dispute or question – whether the plaintiff's particular case of dysautonomia rendered him unable to perform one or more of the duties of his occupation.

In late August 2014, Dr. Ratchford answered "none" when asked to describe what the plaintiff cannot do and again answered "none" when asked to describe what the plaintiff should not do. (Doc. 92-3 at 61).[4] In response to the defendant's request, Dr. Kessler submitted medical records from August 2014, (*id*. at 77-88), but he did not respond to the defendant's written request to describe what the plaintiff cannot or should not do. (*Id*. at 80). Similarly, Dr. Hecker submitted medical records from May to August 2014, (Doc. 92-4 at 1-18), but he left blank the page asking him to describe what the plaintiff cannot or should not do. (*Id*. at 3). Dr. Gokaslan submitted medical records from a July 16, 2014 office visit, (*id*. at 20-23), but they do not address dysautonomia or assign any restrictions to the plaintiff. At a roundtable discussion in November 2014, the defendant's representative observed that, "[r]egarding Neurological issues, Dr. Ratchford (Neurologist) noted 'none' for restrictions or limitations[, and] [t]here are no other providers providing R/L's." (*Id*. at 28). This was a correct statement.

---

[4] The plaintiff dismisses this information as appearing on a mere "fax cover sheet," with the information from, and the signature of, an unknown "someone." (Doc. 102 at 15). The plaintiff is wrong. The document is the same one that every other health care provider was given, and used, for recording patient limitations, and the mere fact the signature is illegible furnishes no grounds for concluding the information is not from Dr. Ratchford, much less that the defendant could not reasonably have thought it was, especially since it accompanied his medical records. (Doc. 92-3 at 56-65).

In addition to the records mentioned above, there is a separate "progress note" from Dr. Gokaslan, dictated on July 16, 2014 and transcribed the next day. (Doc. 92-4 at 87-88). It states that the plaintiff, since his March 2014 visit, has complained of various symptoms, "[s]ome of [which] were consistent with dysautonomia." The note reflects that Dr. Hecker suspected dysautonomia and that Dr. Ratchford "felt that he definitely has some component of dysautonomia." Dr. Gokaslan "recommended that the patient be off work until his next appointment" in early 2015. (*Id*. at 87). The defendant denies receiving this document until January 2015, when the plaintiff submitted it after being notified his benefits were being terminated. (Doc. 91 at 11 n.6, 15, 22 n.10; Doc. 92-4 at 84-88). The plaintiff argues there is a fact issue presented as to when the defendant received the document. (Doc. 102 at 19).

The plaintiff finds it suspicious that these are the only two pages of his medical records that the defendant should have had but did not. He also believes it is obvious from the second page of this document that the document is incomplete. Finally, he claims that representatives of the defendant have admitted reviewing the document before the plaintiff's benefits were terminated. (Doc. 102 at 14, 19-20).

Taking these in reverse order, the deposition excerpts to which the plaintiff cites do not support the stated proposition; while the deponents agreed that they had seen the progress note before their depositions, they were not asked whether they had seen it before the plaintiff's benefits were ended. (Doc. 103-10 at 73-75; Doc. 103-12 at 57-58, 61-62).[5] The Court can find nothing in the second page of the progress note that indicates it is incomplete (especially since it expressly says

---

[5] Patricia Clermont testified she was aware in October 2014 that Dr. Gokaslan had recommended the plaintiff remain off work until early 2015, (Doc. 103-12 at 58-59), but she was not asked whether her awareness came from the progress note. Since (as he points out) the plaintiff had verbally reported the recommendation to the defendant in July 2014, (Doc. 102 at 9; Doc. 92-3 at 32), Clermont would be aware of it even if the progress note had not been received.

it is "Page 2 of 2," (Doc. 92-4 at 88)), but, even if the assertion is true, it is irrelevant to whether the defendant had received it before 2015. And that only these two pages were missing from the claims file does not easily raise an inference they were not really missing, especially given the defendant's uncontroverted evidence that obtaining records from Dr. Gokaslan was challenging. (Doc. 91 at 6, 9). Notably, the plaintiff offers no evidence from Dr. Gokaslan or his office that the progress note was timely sent to the defendant.

Ultimately, though, it does not matter whether the defendant had received the progress note before terminating benefits. While Dr. Gokaslan did "recommend" that the plaintiff remain off work another six months, he did not state the plaintiff was "unable to work," as he did in his April 2014 APS. (Doc. 92-3 at 19). It seems clear that Dr. Gokaslan did not restrict the plaintiff from working but at most thought it a good idea; certainly the plaintiff has offered no explanation how a mere recommendation could amount to a prohibition.

Nor did Dr. Gokaslan tie his recommendation to dysautonomia. The progress note states that, "[f]rom my perspective, the patient overall is doing well, but still does have some interscapular pain below the area of his previous fusion." The next sentence schedules the plaintiff for x-ray studies, and the next recommends that he remain off work. (Doc. 92-4 at 87). A reasonable inference is that Dr. Gokaslan's recommendation was based on the plaintiff's pain, not on symptoms of dysautonomia.

The plaintiff is thus left in the awkward position of arguing that, even though not a single one of his health care providers identified any restrictions or limitations on him due to his suspected dysautonomia, it was nevertheless incontestable in December 2014 that the condition prevented him from performing the duties of his occupation. If the plaintiff were a surgeon or concert pianist, and if his condition were crushed or paralyzed hands, the absence of any medical confirmation of the consequences of his condition would be unimportant. But the

plaintiff is a CEO/consultant, and his condition is a vague, variable one that affects different persons differently.

To bridge the gap, the plaintiff repairs to his physicians' depositions. (Doc. 102 at 11, 13). Dr. Gokaslan described the plaintiff's symptoms as "presenting challenges" and as "appear[ing] to be significant and limiting for him." (Doc. 103-19 at 75-77). Dr. Hecker thought it could be "extremely difficult" for the plaintiff to work as a CEO due to the "unpredictable nature" of the symptoms, since they might crop up at inconvenient times – particularly, while the plaintiff was running a meeting, giving a speech or flying. (Doc. 103-18 at 23, 27, 57). This is underwhelming evidence, but in any event it was not before the defendant in December 2014.

As noted, dysautonomia is an extremely variable condition. The plaintiff makes no argument that his medical records reflect symptoms so severe, frequent and/or enduring that they necessarily would preclude him from performing the duties of his occupation, and the Court's review of those records suggests this was a prudent decision.

To Dr. Ratchford in July 2014, the plaintiff reported Raynaud's phenomenon; dry eyes; photophobia; migraines; scotomas; eye pain; diplopia; tingling; labile blood pressure, resulting in a "spaced out" feeling; dyspnea; and facial swelling. (Doc. 103-3 at 52-53). The migraines were historical only, having "resolved." (*Id*. at 52). As of November 2014, the plaintiff reported to Dr. Hecker that the scotomas were "very well controlled." (*Id*. at 91). The plaintiff told Dr. Ratchford his diplopia was only "occasional" and his facial swelling "intermittent," and he did not complain to Dr. Hecker in November of photophobia, eye pain, swelling, dyspnea (except perhaps during sleep), blood pressure fluctuations or feeling spaced out. (*Id*. at 91-92). Although the plaintiff complained to Dr. Ratchford of "some labile blood pressures," and of "sometimes" feeling spaced out, he identified only two or three instances and

focused on a single episode, accompanied by dyspnea, that lasted four or five hours, (*id*. at 52-53), which implies no other episodes of such duration.

The only symptom mentioned in both July and November that appeared more than occasionally was Raynaud's phenomenon, and there is no evidence either that the plaintiff's episodes last more than a few minutes or that, even during that brief interval, they prevent him from performing the duties of his occupation. The only symptom that Dr. Hecker identified as sufficiently serious to interfere with the performance of the plaintiff's duties is labile blood pressure, (Doc. 103-18 at 23), but there is no evidence that the plaintiff experiences episodes of sudden low blood pressure so frequently that it renders him unable to perform his duties. If the plaintiff were an airline pilot, it is likely that even one such episode would be too many to permit him to fly, but no showing has been made – indeed, no assertion has been proffered –that a CEO subject to infrequent, usually brief episodes of low blood pressure cannot perform his duties as a CEO. Perhaps he cannot, during the episodes themselves, perform all his duties, but that would be equally true for many illnesses, and no one suggests that a CEO's susceptibility to seasonal bouts of the flu would render him disabled.

In another context, the plaintiff points out that Dr. Gokaslan's progress notes of March 2014 reflect that the plaintiff reported having a number of vertigo episodes and receiving a diagnosis of benign positional vertigo. He also mentioned having dissociative episodes, lasting five to six hours, where he feels sort of disconnected. (Doc. 102 at 8; Doc. 103-3 at 18-19). As noted, however, in July the plaintiff associated these episodes with labile blood pressure and identified only a single lengthy episode, and in November he reported no blood pressure or "spaced out" issues at all; in neither case did the plaintiff complain of vertigo. Even the March records make no claim that the dissociative episodes were frequent.

In short, it is clear that, based on the information before it on December 19, 2014, the defendant had a debatable reason for terminating the plaintiff's disability

benefits, since it was far from clear that the symptoms he reported were of such a character, severity, frequency and duration as to render him unable to perform the duties of his occupation. That is, under the evidence and argument presented to the Court, the plaintiff is unable to establish the third element of his claim for bad faith.

The balance of the plaintiff's presentation is given over to criticizing the defendant's investigation, complaining of its changing assessments, and identifying ignoble motivations the defendant might have entertained for prematurely ending the plaintiff's benefits.

In the first category, the plaintiff says the defendant did not give due weight to the evidence of his symptoms; did not consider the effect of those symptoms on the cognitive demands of his occupation; did not understand or seek to understand dysautonomia; disregarded Dr. Gokaslan's July 2014 recommendation that the plaintiff not work; did not seek additional medical records; did not reach out to the plaintiff's doctors for clarification; and obtained an in-house medical opinion based on incomplete records. (Doc. 102 at 2-3, 13-14, 17-18, 27). The plaintiff asserts that the defendant thereby violated its own procedures and code of conduct as well as industry standards. (*Id*. at 19, 23-25, 27). The defendant challenges at least some of these assertions, but the Court need not address them. As noted previously, "regardless of the imperfections of [the insurer's] investigation, the existence of a debatable reason for denying the claim at the time the claim was denied defeats a bad faith failure to pay the claim." *Brechbill*, 144 So. 3d. at 259 (emphasis and internal quotes omitted). Thus, "[a] bad-faith-refusal-to-investigate claim cannot survive where the trial court has expressly found as a matter of law that the insurer had a reasonably legitimate or arguable reason for refusing to pay the claim at the time the claim was denied." *Id*. at 260. As the Court has so found, the plaintiff cannot avoid summary judgment by criticizing the defendant's handling of his claim.

In the second category, the plaintiff notes that the defendant initially found him to be disabled, not only after surgery but also before; that the defendant's nurse determined in April 2014 that his dissociative episodes limited his ability to perform any daily sustained activity on a consistent, reliable basis but, in October 2014, reached a contrary conclusion; and that the defendant's vocational consultant initially deemed the plaintiff's physical restrictions sufficient to keep him from performing his duties (in particular, travel) but reversed course in November 2014.  (Doc. 102 at 4, 8, 14, 16, 26).  The obvious answer is that different evidence can result in different determinations at different times, but in any event the plaintiff's arguments do not address the fundamental, threshold issue of whether the defendant had a debatable reason for terminating benefits in December 2014.  Since the defendant did have such a reason, any internal inconsistencies in how it arrived at that conclusion are immaterial.

In the third category, the plaintiff claims the defendant has a "culture" of seeking early termination of disability benefits, including by providing financial incentives to employees to encourage them to pursue such early termination. (Doc. 102 at 2-3, 20-23).  The defendant strongly denies any wrongdoing, but it is again unnecessary to address the plaintiff's assertions, since they are irrelevant to whether the defendant possessed a debatable reason for terminating the plaintiff's benefits.

## CONCLUSION

For the reasons set forth above, the defendant's motion for partial summary judgment is **granted**.  The plaintiff's bad faith claim is **dismissed with prejudice**.

DONE and ORDERED this 16th day of September, 2016.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE